CITIZENS BANK OF
MASSACHUSETTS,
Plaintiff,

v.

PARHAM–WOODMAN MEDICAL
ASSOCIATES, et al.,
Defendants.

Civ. A. No. 3:94cv028.

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 13, 1995.

William A. Broscious, Pamela G. Parsons, Hazel & Thomas, P.C., Richmond, VA, for plaintiff.

Frank J. Santoro, Marcus, Santoro & Kozak, Portsmouth, VA, for Nilda R. Ante.

Robert A. Canfield, Canfield, Moore, Shaprio & Sease, Richmond, VA, for Larry E. King.

John V. Robinson, Herman Aubrey Ford, III, Russell, Cantor, Arkema & Edmonds, Richmond, VA, for Richard L. Hunley.

Augustus S. Hydrick, Sr., James B. Davis, Davis & Morgan, Richmond, VA, for Joseph Tas and Nada Tas.

Randolph E. Trow, Jr., Poole & Poole, Richmond, VA, for Kenneth E. Brown.

## MEMORANDUM OPINION

PAYNE, District Judge.

This case of first impression presents the need to decide when a partnership's obligation on a debt "arose" for purposes of holding incoming partners personally liable on that debt. See Va.Code § 50–17 (codifying Uniform Partnership Act ("the Act") § 17). The parties stipulated most of the facts and presented evidence on those not stipulated. The issues have been fully briefed and argued.

## BACKGROUND

The predecessor of Citizens Bank of Massachusetts and Parham–Woodman Medical Associates, a Virginia general partnership, entered a Construction Loan Agreement and a term note dated April 30, 1985. The loan, in the principal amount of $2 million, was to fund construction of a medical office building, Parham–Woodman's principal asset. Nilda R. Ante and Larry E. King were the general partners of Parham–Woodman when the Construction Loan Agreement and the note were executed. Ante and King also executed a Guaranty in favor of Citizen's Bank on April 30, 1985.

As contemplated by the documents, Citizen's Bank made advances from time to time during the construction of the building. The first advance was made on April 30, 1985 in the amount of $372,482.61. From then until June 3, 1986, Citizen's Bank made 24 other advances. The advances as of June 3, 1986 totalled $1,457,123.15.

Dr. Richard L. Hunley was admitted as a general partner in Parham–Woodman on June 25, 1986. Nada Tas and her husband, Joseph Tas, also became general partners then, although they contend that they did not become general partners until 1987. From July 2, 1986 through November 17, 1986, Citizen's Bank made eight additional advances in the amount of $542,876.85. Subsequently, Kenneth E. Brown became a general partner in Parham–Woodman.

The medical office building was built, and the partnership made numerous payments but ultimately defaulted. On December 15, 1993, a foreclosure sale brought $912,000 which yielded net proceeds of $890,195.12 to Citizen's Bank.

Judgment has been entered against Parham–Woodman in the amount of $1,218,-244.98. The liability of Ante and King was eliminated by their respective bankruptcy discharges. The parties agree that Brown has no personal liability for partnership debt.

## DISCUSSION

The issues presented in this action are whether Joseph and Nada Tas were partners when the last eight advances were made and whether they and Dr. Hunley, who admittedly was a general partner when those advances were made, are personally liable for those eight advances in the principal amount of $542,876.88, plus interest. Those questions will be considered in turn.

### The Status Of Joseph And Nada Tas

The Tases executed a document entitled "Amendment To Partnership Agreement" which purports to be "made as of this 25th day of June, 1986." The Tases contend that they executed the Amendment and became partners sometime in 1987, not in June 1986. Although there is evidence which, if believed, might permit that conclusion, the preponderance of the evidence shows that the Tases became general partners as of June 26, 1986. A financial statement dated May 9, 1987 reflects that the Tases claimed an interest in Parham–Woodman as of June 1986. The K–1 schedules for Parham–Woodman in 1986 reflect that the Tases and Dr. Hunley were partners in 1986 and that each had the percentage interest set forth in the Amendment executed by the Tases.

Further, during the period June 26, 1986 through July 9, 1986, the Tases made several payments to Parham–Woodman directly or,

in some instances, through Ante who remitted payment to the partnership. Those payments totalled $37,500, and gave the Tases the 6.67% interest reported in the K–1.

The Tases also remitted $35,000 to Parham–Woodman in two installments in May and June 1987. The partnership records show that these payments served to increase the Tases partnership interest to 13.33% from 6.67%. The necessary conclusion is that before those payments were made in 1987 the Tases already owned a 6.67% interest in Parham–Woodman. On this record, the previous interest could only have been acquired in 1986.

Ante and the Tases adamantly insisted in their testimony that the Tases did not become partners until after the 1987 payments and that the earlier payments were loans to Ante. That testimony was not credible when articulated from the witness stand and the court declines to credit that version of events. The testimony is contradicted by the previously-discussed documentary evidence indicating that the Tases interest arose in 1986, not 1987. Further, Ante did not list loans to the Tases as liabilities in her bankruptcy and the Tases made no claim in Ante's bankruptcy. Taken as a whole, the record establishes that the Tases were general partners in Parham–Woodman in June 1986.

Thus, they like Dr. Hunley have personal liability for the last eight advances, totalling $542,876.85, if those advances represent partnership debt which "arose" after they became general partners in Parham–Woodman. The court now considers that issue.

### Were The Last Eight Advances Partnership Debt That Arose After Dr. Hunley and The Tases Became Partners?

■ The court is asked whether, for purposes of Va.Code § 50–17, the partnership obligation associated with the April 30, 1985 Construction Loan Agreement and term note "arose" or was "incurred" before June 25, 1986, the date on which Dr. Hunley and the Tases became partners. The statute provides:

A person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before his admission as though he had been a partner when such obligations were incurred, except that this *liability shall be satisfied only out of partnership property.*

(Emphasis added). Partners are personally (and jointly) liable, on the other hand, for contractual obligations arising after their admission. Va.Code § 50–15(A)(2).

### A. The Agreement

■ The obligation here at issue is a debt which was evinced and defined by contract documents. The first step in analyzing when that debt arose is to examine those documents.

The obligation of Citizen's Bank to lend the funds that created the debt is established by the Construction Loan Agreement. So too is the partnership's borrowing obligation. Paragraph 5 of that agreement provides that:

Subject to all of the terms and conditions hereof, Lender hereby agrees to lend to Borrower, and Borrower hereby agrees to borrow from Lender, the principal amount of the Note [$2 million] in installments from time to time pursuant to the terms of this Agreement and to pay interest monthly on amounts so borrowed at the rate set forth in the Note, it being understood that Borrower shall be liable for the payment of interest only on such sums as shall have been advanced from time to time under this Agreement to Borrower or others.

Thus, on April 30, 1985, Citizen's Bank became obligated to lend Parham–Woodman the total sum of $2 million to be advanced from time to time upon satisfaction of contractually specified conditions precedent to making the advances. At the same time, Parham–Woodman agreed to borrow $2 million from the bank. And, as part of the transaction, the partnership, by its two general partners Ante and King, executed a Note wherein it agreed to pay to the bank or "order the Principal Amount of TWO MILLION ($2,000,000.00) DOLLARS with interest thereon or on such part thereof as may have been from time to time advanced and remain outstanding."

The Construction Loan Agreement required the advances to be applied to the

limited purpose of building construction, and Parham–Woodman agreed that all advances were to be a trust fund solely for that purpose. (¶ 4.14). In recognition of the fundamental and limited purpose to be served by the loan, Parham–Woodman was obligated contractually to cause completion of the construction project. (¶ 4.1).

The terms of the documents, therefore, created in the partnership an entitlement to $2 million payable from time to time on satisfaction of certain conditions precedent and they imposed on the partnership the obligation to repay, with interest, all funds advanced up to $2 million. The partnership entitlement to receive the loan proceeds, and its correlative obligation to repay all proceeds received, were established by the documents executed on April 30, 1985.

The bank was not thereafter free to impose additional conditions precedent to the making of any advance. Nor was the bank free to refuse the advances so long as the contractually specified conditions were satisfied and so long as there were no contractual defaults. Thus, notwithstanding the somewhat contingent arrangement respecting disbursement of the loan, the obligations to disburse the total sum of $2 million and to repay all amounts disbursed up to $2 million (with interest) were fixed on April 30, 1985.

Accordingly, in the commercially acceptable sense of the word and in the written manifestation of the intent of the contracting parties, the debt "arose" on April 30, 1985 subject to defeasance only upon failure of the conditions precedent to disbursement or some default.

The partnership agreement, of which the bank admittedly received a copy, and the practice followed in disbursing the advances also are instructive. (Stip., ¶ 9). That agreement, at Art. X, states, "No Partner, except by the unanimous agreement in writing of the other Partners, shall: (a) Borrow money in the Partnership name...." (Ex. F). The Construction Loan Agreement and note were signed by the only two then existing partners. See Exs. A, B. The disbursement applications, on the other hand, were consistently signed by only one of the partners, Larry E. King, even after Dr. Hunley

and the Tases became partners. See Ex. G. Nor does it appear that all of the partners ever signed a written agreement to justify the disbursements of advances or that the bank believed that such a written agreement had been entered or was required. The most apparent explanation for this procedure is that both parties, the bank and the partnership, conducted their affairs under the jointly held belief that no new loan was being made on the event of disbursing an advance and that the obligation had already "arisen."

## B. Partnership Law And Partnership Business

■ Resolution of the dispositive issue also requires consideration of the Uniform Partnership Act and its effect on the nature and extent of the liabilities of incoming partners. This necessitates an examination of the language of the Act, the intent of the Act's drafters and the interpretation of the Act by other jurisdictions. See Va.Code § 50–4(4) ("This chapter shall be so interpreted and construed as to effect its general purpose to make uniform the law of those states which enact it.").

Section 17 of the Act, codified at Va.Code § 50–17, makes an incoming partner liable for "all the obligations of the partnership arising before his admission," but provides that "this liability shall be satisfied only out of partnership property." Section 17 altered slightly the common law because, at common law, admission of a new partner dissolved the old partnership and created a new one. New creditors, then, were preferred over creditors of the old partnership when partnership assets were sought to cover unpaid partnership debts. See Annotation, Liability of Incoming Partner for Existing Debts, 45 A.L.R. 1240 (1926). To remedy this unfairness to creditors, drafters of the Act removed the preference with respect to partnership assets. "So as to preserve the present law as nearly as possible," however, and presumably to continue the common law's fair treatment of incoming partners, the drafters provided that for pre-existing debts, "liability of the incoming partner shall be satisfied only out of partnership property." See Uniform Partnership Act § 17, 6 U.L.A. 208 (West 1969)

(official comment). "It, therefore, results that existing and subsequent creditors have equal rights as against partnership property and the separate property of all the previously existing members of the partnership, while only the subsequent creditors have rights against the separate estate of the newly admitted partner." *Id.*

Decisions before and after adoption of the UPA suggest the reason why the law restricts an incoming partner's personal liability, a restriction maintained by the Act. Specifically, where a partnership undertakes a debt before a new partner is made, "[t]he credit of [the] new member ... does not enter into the consideration of the creditors of the old firm, and it would be manifestly unjust to hold the new partner liable." *Stephens v. Neely*, 161 Ark. 114, 255 S.W. 562, 45 A.L.R. 1236, 1240 (1923); *see Babcock v. Stewart*, 58 Pa. 179 (1868) (stating a similar justification); *Wolff v. Madden*, 6 Wash. 514, 33 P. 975 (1893) (noting that no evidence suggested that credit had been given because of the new partner's future relationship with the firm). These decisions and the longstanding principle which they confirm support the view that a partnership obligation arises, within the meaning of Section 17, when the creditor extends the credit to the partnership. In this instance, that occurred on April 30, 1985 and not on the occasion when the bank disbursed each advance.

In *Davis v. West*, 74 F.Supp. 495 (W.D.Mo. 1947) the partnership executed a contract before the new partner was, admitted, but received a check as part of the consideration after his admission. This, the court found, was insufficient to impose liability on the new partner's personal assets. The court reasoned that

> no penalties should attach to a partner who had nothing to do with a transaction that was closed before he became a partner. The fact that he received into his hands a check which was part of the consideration does not involve him in any way with the transaction.

*Id.* at 496.

Here the documents were executed long before Dr. Hunley and the Tases joined Parham–Woodman and, upon execution, they were binding obligations on both Citizen's Bank and the partnership. That is not changed merely because the passage of part of the consideration was delayed pursuant to a schedule which also was set before Dr. Hunley and the Tases became partners.

According to Plaintiff, two cases, one of which is presently certified to the Supreme Court of New Jersey, suggest otherwise. First, Plaintiff points to *Ellingson v. Walsh, O'Connor & Barneson*, 15 Cal.2d 673, 104 P.2d 507 (1940), where the court held that a new partner was personally liable for rent by virtue of a lease which the partnership executed before he became a partner. Observing that the obligation to pay rent arises both from privity of contract and privity of estate, the court concluded that "[w]hether [the new partnership] was liable contractually on the lease [was] immaterial; it became liable for rent as a tenant." *Id.*, 104 P.2d at 509. The court found that therefore the obligation "arose," for purposes of Section 17, "continually throughout the period of his occupation." *Id.* at 510.

Thus, in *Ellingson* the liability imposed on the incoming partner was created not by the contract, which predated his admission, but by operation of basic principles of property law that impose liability for tenancy with or without a contract. The tenancy existed after the new partner was admitted, and he was held liable for the financial consequences of the tenancy after he became a partner. For this reason, *Ellingson* does not control the result here.

The other decision on which Plaintiff relies is *Conklin Farm v. Leibowitz*, 274 N.J.Super. 525, 644 A.2d 687, *cert. granted*, 138 N.J. 269, 649 A.2d 1288 (1994), wherein an intermediate appellate court reversed a trial court and found that a new partner was personally liable for "interest on a preexisting partnership promissory note accrued for periods of time after admission into the partnership." *Id.*, 644 A.2d at 689. Relying heavily on *Ellingson* and persuaded by an analogy which likened interest on a note to "rent" for money, the appellate court determined that Section 17 did not preclude holding a new partner personally liable for interest on a

note clearly executed before her admission to the partnership. The court stressed the benefit that the partnership gained during the new partner's tenure—not repaying the full amount of the note—and found this benefit was akin to the benefit to a new partner from a long-term lease and therefore warranted an imposition of liability. *Id.* at 690.

The *Conklin Farm* court missed the important point of *Ellingson*. It may be that interest on a note in a general sense is similar to "rent" for money. However, there is no principle of negotiable instruments law that creates an obligation to pay that "rent" independent of the contract. Moreover, the fact that a new partner receives a benefit from a contract entered before her admission does not affect the time at which the contractual obligation arose. For these reasons, the logic of *Conklin Farm* is unpersuasive.

### CONCLUSION

The interpretation of Section 17 reflected here is consistent with the language of the statute, with commercial reality as evinced by the applicable documents, and with the articulated purposes which Section 17 was enacted to achieve. This rule enables potential creditors of the partnership to know that what they see of a partnership is what they can reach and it permits potential incoming partners to avoid surprise liabilities. Creditors, of course, can construct and administer loans to partnerships in such a fashion as to reach the personal assets of partners admitted during the disbursement of term payments. However, absent such a basis, the personal assets of an incoming partner are not available to satisfy post-admission advances under the terms of a pre-admission contract.

The court finds that all of the partners are liable for the debt owed the bank, but that the liability of Kenneth E. Brown, Richard L. Hunley, Joseph Tas, and Nada Tas may be satisfied only out of partnership assets.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.