IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN, *ex rel.* JKJ PARTNERSHIP 2011 LLP, | § § § § § § § § § § § § § § § § § § § § § § § § | No. 256, 2019 Certification of Questions of Law from the United States Court of Appeals for the Third Circuit C.A. No. 18-2472 |
| Relator Below, Appellant, | § § § § | |
| v. | § § | |
| SANOFI-AVENTIS U.S. LLC, SANOFI-AVENTIS U.S. SERVICES, INC., AVENTIS, INC., AVENTIS PHARMACEUTICALS, INC., BRISTOL-MYERS SQUIBB COMPANY, BRISTOL-MYERS SQUIBB PHARMACEUTICALS HOLDING PARTNERSHIP, | § § § § § § § § | |
| Defendants Below, Appellees. | § § § § § § § | |

Submitted:    January 15, 2020
Decided:       March 17, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR** and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon Certification of Questions of Law from the United States Court of Appeals for the Third Circuit.  **CERTIFIED QUESTIONS ANSWERED**.

Jessica Zeldin, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Of Counsel:  William H. Narwold, Esquire, Mathew P. Jasinski, Esquire (*argued*), Motley Rice LLC, Hartford, Connecticut; W. Scott Simmer, Esquire, Baron & Budd, P.C., Washington, District of Columbia for Appellants.

Kenneth J. Nachbar, Esquire (*argued*), Coleen W. Hill, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware;  Of Counsel:  Anand Agneshwar, Esquire, Arnold & Porter Kaye Scholer LLP, New York, New York; John P. Elwood, Esquire, Kirk Ogrosky, Esquire, Daniel S. Pariser, Esquire, Murad Hussain, Esquire, Anna K. Thompson, Esquire, Arnold & Porter Kaye Scholer LLP, Washington, District of Columbia for Appellees.

**VALIHURA**, Justice:

We are asked by the United States Court of Appeals for the Third Circuit to answer three questions of law certified to us in accordance with Delaware Supreme Court Rule 41 (the "Questions"):

1. A limited liability partnership is formed to file and prosecute a specific lawsuit. Its formational documents say both that the partnership is not "a separate legal entity distinct from its Partners" under 6 Del. Code § 15-201(a) and that the "withdrawal of a Partner shall not cause a dissolution of the Partnership." If one of the partners leaves the partnership and a new partner joins, does it stay the same partnership? Or is it a new partnership?

2. If a "new" partnership was created upon the limited liability partnership's change in membership, was the "old" partnership terminated immediately such that it was actually the "new" partnership that filed the second amended complaint? Or did the "old" partnership continue to exist long enough in the winding-up process to file the second amended complaint?

3. If the "old" limited liability partnership did not survive the membership change, may the original partners continue to prosecute the lawsuit as part of the "winding up" process?

The Questions arise in connection with the prosecution of a *qui tam* action under the False Claims Act ("FCA"),[1] *In re: Plavix Marketing, Sales Practices and Products Liability Litigation (No. II)*,[2] brought against Sanofi-Aventis U.S. LLC, Sanofi-Aventis U.S. Services, Inc., Aventis, Inc., Aventis Pharmaceuticals, Inc., Bristol-Myers Squibb Company, and Bristol-Myers Squibb Pharmaceuticals Holding Partnership (together, the "Defendants"). The relator bringing the action, on behalf of the United States and several states, is JKJ Partnership 2011 LLP, a Delaware limited liability partnership. The

---

[1] 31 U.S.C. § 3729, *et seq.*

[2] 315 F. Supp. 3d 817 (D.N.J. 2018), *appeal docketed*, No. 19-2472 (3d Cir. July 3, 2018) [hereinafter *Opinion*].

partnership consists of three individuals who allegedly are each an "original source" of knowledge upon which the allegations against Defendants are based.

The Questions arose when one of the partners was replaced by another partner, and an amended complaint was filed shortly thereafter. Upon the filing of the amended complaint, the Defendants moved to dismiss, alleging, in-part, that replacing the partner was impermissible the under the FCA's "first-to-file" bar. The United States District Court for the District of New Jersey (the "District Court") granted the motion on that ground. The partnership appealed to the Third Circuit, which, in turn, certified the Questions that relate to the "construction or application of" a Delaware statute "which has not been, but should be, settled by" this Court.[3]

This is the opinion of the Court on the certified questions.

## I. Factual and Procedural Background

### A. The Qui Tam Litigation

Under our Rule 41, we rely only upon the undisputed facts. However, we provide some background from the District Court's May 30, 2018 Opinion (the "Opinion"),[4] as supplemented by the record before us, purely to provide context for the reader.

On October 26, 2011, two doctors and a Sanofi sales representative formed JKJ 2011 Partnership LLP ("JKJ"), a Delaware limited liability partnership. According to

---

[3] App. to Opening Br. at A180 (3d Cir. Order of Certification).

[4] *Opinion*, 315 F. Supp. 3d 817.

JKJ's Partnership Agreement (the "Partnership Agreement"), JKJ was formed "to file and prosecute" a whistleblower action against the Defendants.[5]

Section 1.03 of the Partnership Agreement states that "the Partnership shall not be a separate legal entity distinct from its Partners."[6] The District Court explained the likely reason for this provision:

> Although the Third Circuit has not resolved the issue, the consensus of persuasive precedent suggests that, were JKJ a separate legal entity, the fact that it did not exist at the time the alleged fraud occurred would prevent it from being an "original source" with direct knowledge of the fraud under the pre-amendment FCA.[7]

On November 4, 2011, nine days after it was formed, JKJ filed the original *qui tam* complaint (the "Complaint") in the District Court, alleging that the Defendants failed to disclose, as required by law, certain information regarding Plavix,® an antiplatelet drug used to prevent heart attacks and strokes. The Complaint kept the partners' identities anonymous, identifying them as "Partner A," "Partner B," and "Partner C." The Partnership Agreement identified the partners as Jeffrey Stahl, Kelly Wood, and John Venditto.[8]

On February 22, 2017, JKJ filed a second amended complaint (the "SAC"), further developing its claim of Plavix's® ineffectiveness for certain patients based on their genetic makeup. JKJ alleges that Defendants made affirmative misrepresentations by

---

[5] App. to Opening Br. at A110, A112 (Partnership Agreement).

[6] *Id.* at A111.

[7] *Opinion*, 315 F. Supp. 3d at 831.

[8] App. to Opening Br. at A110.

"systematically and deliberately promot[ing] Plavix through false and misleading advertising [and other marketing materials] that overstated [the drug's] efficacy, and minimized critical adverse event and risk information. Defendants would brand this their 'Expand and Protect' strategy."[9] JKJ alleges that Defendants created a logo used on Sales and Marketing material to reflect this strategy.[10] According to JKJ, based upon this strategy, "Defendants 'protected' Plavix by selling the drug's safety and efficacy in *all* patients in spite [of] the fact that Defendants knew it was false."[11]

After filing the Complaint, but before filing the SAC, Partner B (John Venditto) withdrew from JKJ, and was replaced by Dr. Paul A. Gurbel ("Partner G"). On August 9, 2017, the District Court, *sua sponte*, requested that the parties brief the question of whether JKJ was a proper relator capable of continuing the litigation in light of the replacement of Partner B with Partner G.

In response to the Court's inquiry, on October 11, 2017, Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). In their motion, Defendants argued that, (i) if JKJ is deemed to be the relator in its own right, the FCA's public disclosure bar precludes JKJ's claims, (ii) if JKJ is deemed to be a pass-through entity for its members, who are the real relators in this action, then JKJ lacks Article III associational standing to proceed as the plaintiff in this case, (iii) JKJ's continuation as the plaintiff after the substitution of Partner G for Partner B is prohibited by the FCA's first-

---

[9] *Opinion*, 315 F. Supp. 3d at 821 (citing SAC, ¶ 249).

[10] *Id.*

[11] *Id.* (emphasis in original).

6

to-file bar, and (iv) any curative amendment to add JKJ's members as plaintiff relators is also prohibited by the first-to-file bar. JKJ filed a cross-motion for leave to file a third amended complaint to name its current members, as well as JKJ, as the relator plaintiffs in this action.

On May 30, 2018, the District Court dismissed the SAC under Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction. It also denied JKJ's cross motion for leave to amend. In determining whether the first-to-file bar applied, the District Court considered whether the substitution of Partner G for Partner B brought about an intervention of a new private party into the case.[12] It held that because the JKJ that filed the SAC was a different partnership from the JKJ partnership that had filed the Complaint, there had been an "intervention" of a new private party in contravention of the first-to-file bar.

The District Court analyzed Delaware partnership law in reaching its conclusion. It examined Delaware's previous partnership law regime, the Delaware Uniform Partnership Act ("DUPA"), and the current statute, the Delaware Revised Uniform Partnership Act ("DRUPA"), and how they aligned with the "aggregate theory" and the "entity theory" of partnerships. It explained that although membership changes do not create a new partnership under DRUPA (which follows the entity model as a default), the DUPA embraced the aggregate theory, and thus, "the addition or subtraction of members from the

---

[12] *Id.* at 829–30 ("The first-to-file bar provides that, once a *qui tam* action has been brought on a claim, 'no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.'" (quoting *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 120 (D.C. Cir. 2015) (citing 31 U.S.C. § 3730(b)(5))) (internal quotation marks omitted)).

7

partnership created new partnerships."[13] The court concluded that because the partners expressly opted out of the entity model in Section 1.03 of the Partnership Agreement, as permitted by DRUPA under 6 *Del. C.* § 15-201, "the partnership necessarily became the aggregate form; that is, the members of the partnership are legally *indistinct* from the partnership entity itself."[14] It explained that, "[s]uch an aggregate partnership, which exists as an association of individuals rather than a separate legal entity, does not survive changes in membership, but becomes a new partnership between the new and remaining members."[15] Thus, the District Court reasoned that it was the new partnership that had filed the SAC:

> Once JKJ's original members opted out of the entity model, as permitted by §15–201(a), they could not retain the benefits of a legally separate JKJ entity for litigation purposes. Any finding to the contrary would lead to the absurd result that JKJ would be permitted to proceed as a relator because it is legally indistinguishable from, and therefore directly possesses the knowledge of, its members, but would also be permitted to change its membership without becoming a different legal entity because it is legally independent and distinguishable from its present membership. Put simply, JKJ cannot have it both ways.[16]

Accordingly, the District Court granted the Defendants' Rule 12(b)(1) motion and dismissed the Complaint on the basis that the FCA's first-to-file rule barred the intervention of a newly formed partnership as a party-plaintiff.

---

[13] *Id.* at 833.

[14] *Id.* at 834 (emphasis in original).

[15] *Id.*

[16] *Id.* at 832.

JKJ filed a motion to alter or amend the May 30 decision pursuant to Fed. R. Civ. P. 59(e) on June 26, 2018, which was denied on August 6, 2018.

On June 29, 2018, JKJ filed a notice of appeal to the United States Court of Appeals for the Third Circuit. It argued that the District Court erred when it held that JKJ's change in partners created a new partnership, and that even if the change in partnership had triggered a dissolution of the original partnership, Partners A, B, and C would remain relators in the case and could pursue the unfinished business of the partnership (*i.e.*, pursue the *qui tam* action to its conclusion).[17] The Third Circuit panel certified the Questions to this Court on June 12, 2019. We accepted certification on June 19, 2019.

*B. The Undisputed Facts*

In accordance with our Court's Rule 41, the Third Circuit submitted the following undisputed facts:[18]

a. JKJ Partnership 2011 LLP is the relator in this *qui tam* action. It is a limited liability partnership organized under Delaware's Revised Uniform Partnership Act.

b. JKJ's partnership agreement says that its sole purpose "is to file and prosecute" this action.

c. One section of JKJ's partnership agreement says: "As authorized by Section 15-201(a) of the Act, the Partnership shall not be a separate legal entity distinct from its Partners. In the event of any conflict between the terms of this Section . . . and the terms of any other Section of this Agreement, the terms of this Section . . . shall control."

---

[17] App. to Opening Br. at A28–A29 (JKJ's 3d Cir. Opening Br.).

[18] *Id.* at A179 (3d Cir. Order of Certification). We treat these facts as undisputed for the purposes of deciding these legal issues. *See Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1021 (Del. 2001).

d.  Another section of JKJ's partnership agreement says that the "withdrawal of a Partner shall not cause a dissolution of the Partnership."

e.  After this action began, one of JKJ's founding partners withdrew.  A new partner replaced him.

f.  The new partner arrangement continued to prosecute this action by filing a second amended complaint.

## II.        Standard of Review

Certified questions of law are reviewed *de novo*.[19]    This Court reviews interpretations of written partnership agreements *de novo*.[20]   Our review is based on the facts in the Order of Certification.[21]  In addition to these undisputed facts, we also refer to other provisions of the Partnership Agreement that we find relevant to our analysis.  To the extent we refer to the Complaint and SAC, we recognize that the allegations therein are disputed.

## III.        Analysis

A.  *If one of the partners leaves the partnership and a new partner joins, does it stay the same partnership?  Or is it a new partnership?*

For the reasons explained below, we hold that the change in membership created a new partnership and caused a dissolution of the original JKJ.

---

[19] *Lambrecht v. O'Neal*, 3 A.3d 277, 281 (Del. 2010).

[20] *See Parkcentral Global, L.P. v. Brown Inv. Mgmt., L.P.*, 1 A.3d 291, 295–96 (Del. 2010); *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 170 (Del. 2002).

[21] Supr. Ct. R. 41(c)(iv); *Waters v. U.S.*, 787 A.2d 71, 72 (Del. 2001); *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage,* 744 A.2d 457, 458 (Del. 1999).

*1. Background of Statutory Scheme—Partnerships under Common Law, the Uniform Acts, and Delaware Law*

For background purposes, we begin with the two models of partnership identified by the District Court:  the aggregate and entity models.[22]  The Partnership Agreement at issue here contains elements of both.

Under the aggregate theory, "a partnership is an aggregate of individuals and does not constitute a separate legal entity."[23]  "The partnership has no legal existence apart from its members and cannot sue or be sued in the firm name."[24]  This is in contrast to the entity theory of partnership, where the partnership is a legal person, *i.e.*, an entity separate from its constituent partners.[25]

The "aggregate concept of partnership was universally accepted" at common law.[26]  "Historically, a partnership, unlike a corporation[,] did not enjoy 'entity' status, [*i.e.*], it

---

[22] *See Opinion*, 315 F. Supp. 3d at 834 ("As I have explained, two distinct models of partnership structure exist—aggregate and entity.").

[23] 68 C.J.S. *Partnership* § 93 (2020); Allan Donn, Robert W. Hillman & Donald J. Weidner, *Revised Uniform Partnership Act Section 201* (2019–2020 ed.) [hereinafter *RUPA Annotated § 201*].

[24] 68 C.J.S. *Partnership* § 93 (2020).

[25] *See* Gary S. Rosin, *The Entity-Aggregate Dispute:  Conceptualism and Functionalism in Partnership Law*, 42 Ark. L. Rev. 395, 397–98 (1989); *Silliman v. DuPont*, 302 A.2d 327, 331 (Del. Super. 1972), *aff'd sub nom. F.I. Du Pont, Glore Forgan & Co. v. Silliman*, 310 A.2d 128 (Del. 1973) (equating "entity" status of a partnership to being considered a "jural person"); *Fairway Dev. Co. v. Title Ins. Co. of Minn.*, 621 F. Supp. 120, 122 (N.D. Ohio 1985) (noting that "Ohio follows the common law aggregate theory of partnership, under which a partnership is regarded as the sum of the persons who comprise the partnership, versus the legal entity theory of partnership, under which the corporation, like a partnership, is regarded as an entity in itself").

[26] *Silliman*, 302 A.2d at 331 (citing *Rowley on Partnerships*, 2d ed., Sec. 1.3); J. William Callison & Maureen A. Sullivan, *Partnership Law & Practice* § 3:1 (2019) ("At common law, a partnership was considered to be an *aggregate* of the individual partners . . . . Extrapolating the *aggregate*

had not been considered a jural person but a collection of persons with aggregate rights."[27]

At common law, a partner dissociating from the partnership would cause dissolution of the partnership.[28]

The Uniform Partnership Act ("UPA"), adopted in 1914 by the Conference of Commissioners on Uniform State Laws, generally adopted the aggregate approach to partnerships.[29] Although it adopted much of the aggregate approach, the UPA did not wholly embody it. The original drafting committee of the UPA initially was "split on philosophical grounds over whether the UPA should follow the separate entity theory or

---

theory to its extreme, a partnership is nothing more than a relationship between persons acting for a common business purpose." (emphasis in original)).

[27] *Silliman*, 302 A.2d at 331.

[28] *See, e.g.*, *Evans v. Gunnip*, 135 A.2d 128, 130 (Del. 1957) (noting that upon a partner's withdrawal from the partnership, a new partnership was immediately formed between the remaining partners); *Fike v. Ruger*, 754 A.2d 254, 263 (Del. Ch. 1999), *aff'd*, 752 A.2d 112 (Del. 2000) (noting that in a common law general partnership, "each partner may at any time withdraw and cause a dissolution"); *Weeks v. McMillan*, 353 S.E.2d 289, 291 (S.C. Ct. App. 1987) ("The common law rule is that both the admission of a partner and the withdrawal of a partner will effect a dissolution."); *Citizens Bank of Mass. v. Parham-Woodman Med. Assocs.*, 874 F. Supp. 705, 708 (E.D. Va. 1995) ("[A]t common law, admission of a new partner dissolved the old partnership and created a new one."); *Troupe v. Seby*, 416 F.2d 514, 519 (9th Cir. 1969) ("It is a well-established general rule tha[t] an existing partnership is dissolved and a new partnership is formed whenever a partner retires or a new one is admitted." (citing *Johnson v. Hill*, 1 Ariz. App. 290, 402 P.2d 225 at 226 (1965))); *Liability of incoming partner for existing debts*, 45 A.L.R. 1240 § I (1926) ("It is settled beyond all question . . . that, upon what we in common parlance designate 'the admission of a person into a partnership,' there is, ipso facto, [ ] a dissolution of the existing copartnership and the formation of a new one . . . ."). *See also* Rosin, *supra* note 25, at 420 (stating that, "[a]t common law, any change in partner composition resulted in dissolution of the old partnership and the creation of a new partnership to continue the business").

[29] *See Helvering v. Smith*, 90 F.2d 590, 591 (2d Cir. 1937) (Hand, J.) (noting that "[t]he Uniform Partnership Act . . . did not . . . make the firm an independent juristic entity," and that, "it would be a palpable perversion to understand the [UPA] as creating a new juristic person").

the aggregate theory."[30]  Within the regime are characteristics distinctly based in entity

theory.[31]  For example, the UPA states that partners are agents of the partnership;[32] partners

must account to the partnership for profits arising from their individual use of partnership

property;[33] and the partners do not have individual rights to possess and use partnership

property.[34]

---

[30] *Should the Uniform Partnership Be Revised?*, 43 Bus. Law. 121, 122 (Nov. 1987); *see also Helvering*, 90 F.2d at 91 (noting that, "[t]he Commission did indeed start out to [make partnerships an independent juristic entity] . . . . But . . . the Conference in 1911 after a very full discussion chose to retain the pluralistic notion of the firm, as the English chancellors had painfully worked it out from the bare common-law, which recognized only joint owners and joint obligors"); Callison & Sullivan, *supra* note 26, at § 3:1; William Draper Lewis, *The Uniform Partnership Act*, 24 Yale L. J. 617, 640 (1915) (the successor drafter of the UPA recalling that though his predecessor prepared two drafts of the act based on entity theory, the members of the Conference subsequently "all joined in recommending that the Act be drawn on the common law or aggregate theory").

[31] "Even if the UPA appears on its face to adopt an aggregate approach to partnerships, a close examination of the UPA demonstrates a preponderance of entity-type characteristics:  partnerships can hold title to property; partners do not have individual rights to possess and use partnership property, and are required to account to the partnership for profits arising from their individual use of partnership property; partners are agents of the partnership and can contractually bind it; partners have financial relationships with the partnership; and, the partnership business can continue after dissolution, albeit technically in a new partnership."  Callison & Sullivan, *supra* note 26, at § 3:1.

[32] UPA § 9(1); *see also* 6 *Del. C.* § 1509(a) (repealed 1999).

[33] UPA § 21; *see also* 6 *Del. C.* § 1521 (repealed 1999).

[34] UPA §§ 8, 25; *see also* 6 *Del C.* §§ 1508, 1525 (repealed 1999).  One commentator has argued that:  "These extracts seem more consistent with the entity than with the aggregate view of the nature of the partnership and illustrate the difficulty, if not impossibility, not only of writing and talking about the partnership, but of formulating its rights and obligations without treating it as a legal person."  Judson A. Crane, *The Uniform Partnership Act: A Criticism*, 28 Harv. L. Rev. 762, 771 (1915).  "The evolution of the Uniform Partnership Act and its adoption by more than forty states has not settled the 'entity vs. aggregate' conflict," and the "Act has been viewed as a realistic accommodation of entity theory to aggregate practice which leaves unresolved many problems concerning the legal nature of partnerships, including capacity to be sued."  *Silliman*, 302 A.2d at 332 n.4 (citing Jensen, *Is a Partnership Under the Uniform Partnership Act an Aggregate or an Entity?*, 16 Vand. L. Rev. 377 (1963)).

However, the UPA adopted the key aggregate principle of having partnerships be an aggregation of individuals. Section 6(1) of the UPA defined a partnership as "an association of two or more persons to carry on as co-owners a business for profit."[35] Generally, under the UPA, a partnership dissolved when a partner left the partnership.[36] In this regard, Section 29 of the UPA stated that "[t]he dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business."[37] Section 30 of the UPA provided that, "[o]n dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed."[38] Delaware enacted the DUPA, its version of the UPA, in 1947.[39] Section 1506(a) of the DUPA defined a "partnership" as "an association of 2 or more persons to carry on as coowners a business for profit and includes, for all purposes of the laws of this State, a registered limited liability partnership."[40]

---

[35] UPA § 6(1).

[36] *See RUPA Annotated § 201*, *supra* note 23, at Annotated Cmt. 4(c) (stating that, "[u]nder the U.P.A., a partnership was 'dissolved' whenever a partner departed. Some states also interpreted the U.P.A. to mean that a partnership also is dissolved whenever a new member is added. Neither is the case under R.U.P.A.").

[37] UPA § 29; *see* Donald J. Weidner & John W. Larson, *The Revised Uniform Partnership Act: The Reporters' Overview*, 49 Bus. Law. 1, 4 (Nov. 1993) ("The UPA section 29 definition of dissolution embodies the concept that a partnership is a unique aggregation of individuals, a specific cast of characters. The unique cast is 'dissolved' whenever a partner leaves."). The parallel DUPA provision was 6 *Del. C.* § 1529.

[38] UPA § 30; *see also* 6 *Del. C.* § 1530 (repealed 1999).

[39] 6 *Del. C.* § 1501, *et seq.* (repealed 1999).

[40] 6 *Del. C.* § 1506(a) (repealed 1999).

Delaware repealed the DUPA in 1999, and adopted the Delaware Revised Uniform Partnership Act, 6 *Del. C.* §§ 15-101 *et seq.*[41] DRUPA is modeled after the model Revised Uniform Partnership Act ("RUPA"),[42] but it also added features drawn from other states' versions of RUPA, from the Delaware Revised Uniform Limited Partnership Act, and the Delaware Limited Liability Company Act to increase flexibility and add clarity.[43] It is clear that "RUPA embraces the entity theory of partnership."[44] This was made explicit in Section 201(a) of RUPA, which states, "A partnership is an entity distinct from its partners."[45] The Official Comments to the RUPA make the shift clear:

> RUPA embraces the entity theory of the partnership. In light of the UPA's ambivalence on the nature of partnerships, the explicit statement provided by

---

[41] The effective date of the DRUPA was January 1, 2000 for partnerships formed on or after that date, and was effective for all other partnerships on January 1, 2002, unless any such partnership elected to be governed by DRUPA prior to January 1, 2002. 6 *Del. C.* § 15-1206.

[42] *See* Del. S.B. 176, 140th Gen. Assemb. (1999) (approved July 12, 1999); *Hynansky v. Vietri*, 2003 WL 21976031, at *5 n.35 (Del. Ch. Aug. 7, 2003) (noting that DUPA was repealed in 1999 and replaced with DRUPA, codified as 6 *Del. C.* § 15-101, *et seq.*).

[43] At the end of its June 1999 session, the General Assembly adopted amendments to the Delaware Revised Uniform Limited Partnership Act, 6 *Del. C.* §§ 17-101 *et seq.*, as well as to the Delaware Limited Liability Company Act, 6 *Del. C.* §§ 18-101 *et seq.*

[44] *RUPA Annotated § 201*, *supra* note 23, at Official Cmt. 3 (stating that, "[a]lthough the U.P.A. adopted an entity theory for some purposes, the aggregate model predominated," and that, "[i]n R.U.P.A., the reverse is true"); Callison & Sullivan, *supra* note 26, at §3:1. But like the UPA, RUPA does not wholly adopt the dominant model; it contains features that reflect the aggregate theory. Thus, it has been noted that "even under RUPA the better statement is that a partnership is a hybrid organization that is considered an entity for some purpose and an aggregate for others." *Id.* at n.13.

[45] RUPA § 201(a); Weidner & Larson, *supra* note 37, at 3 ("Before the drafting was complete, it became clear that the entity approach was adopted in virtually every situation. That approach provides simpler rules and is consistent with RUPA's attempt to give partnerships greater stability. Accordingly, as the project drew to a close, RUPA was amended to include a statement that partnerships are entities."); *RUPA Annotated § 201*, *supra* note 23, at Annotated Cmt. 1 ("Section 201 was added to reflect the fact that many of R.U.P.A.'s provisions are based on an entity model.")

subsection (a) [of Section 201] is deemed appropriate as an expression of the increased emphasis on the entity theory as the dominant model.[46]

The Official Comments to RUPA also explain the motivation behind the shift:

> Giving clear expression to the entity nature of a partnership is intended to allay previous concerns stemming from the aggregate theory, such as the necessity of a deed to convey title from the "old" partnership to the "new" partnership every time there is a change of cast among the partners. Under RUPA, there is no "new" partnership just because of membership changes.[47]

> . . .

> RUPA's move to the entity theory is driven in part by the need to prevent a technical dissolution or its consequences. Under RUPA, not every partner dissociation causes a dissolution of the partnership.[48]

Under the RUPA's Section 801, a partnership generally will continue to exist notwithstanding the dissociation of a partner. The withdrawal of a partner is a "dissociation" that results in a dissolution of the partnership only in certain limited circumstances.[49] Many dissociations result merely in a buyout of the withdrawing partner's interest, as opposed to a winding up of the partnership's business. The RUPA distinguishes departures that cause a winding up from those which only cause a buyout of the departing partners. Article 6 applies to all "dissociations;" Article 7 applies to all dissociations that result in a buyout of a partners; and Article 8 applies if there is a dissolution and winding

---

[46] *RUPA Annotated § 201*, *supra* note 23, at Official Cmt.

[47] *RUPA Annotated § 201*, *supra* note 23, at Official Cmt.

[48] Allan Donn, Robert W. Hillman & Donald J. Weidner, *Revised Uniform Partnership Act Section 801*, Official Cmt. 1 (2019–2020 ed.) [hereinafter *RUPA Annotated § 801*].

[49] *See* Christine A. Hurt, D. Gordon Smith, Alan R. Bromberg & Larry E. Ribstein, *Bromberg and Ribstein on Limited Liability Partnerships, The Revised Uniform Partnership Act, and the Uniform Limited Partnership Act (2001)* 557 (2013 ed.) [hereinafter *Bromberg & Ribstein*] (citing to Appendix A, Prefatory Note of the UPA).

up of the partnership business. Events causing a dissolution and winding up include a partnership at will having notice of a partner's express will to withdraw, the expiration of the term in a term partnership, events agreed to as resulting in the winding up of the partnership's business, and judicial dissolutions.[50]

The synopsis to Delaware's legislation implementing the DRUPA explains the major changes as follows:

> This Bill contains Delaware's version of the Uniform Partnership Act of 1994, as amended in 1996 and 1997 by the National Conference of Commissioners on Uniform State Laws, popularly known as the "Revised Uniform Partnership Act" or "RUPA." As such, it will replace Delaware's Uniform Partnership Law, 6 *Del. C.* Chapter 15, which was based upon the Uniform Partnership Act which was promulgated by the Uniform Laws Commissioners in 1914. This Bill is a substantial modernization of general partnership law in that, inter alia, it emphasizes the contractual nature of the relationship among partners; *primarily treats general partnerships as entities, rather than aggregates; generally provides that a partnership does not dissolve upon the dissociation of a partner*; contains more extensive treatment of fiduciary duties of partners; and introduces provisions for the public filing of various types of statements and certificates containing information about the partnership, including the agency authority of one or more of its partners.
>
> This Bill applies to general partnerships many of the procedures which have proven popular for Delaware limited partnerships and Delaware limited liability companies. It also continues to permit limited liability partnerships.
>
> Adoption of this Bill will continue Delaware's role as a leading jurisdiction for the formation of business entities and will permit Delaware to join other states which have already adopted their version of RUPA.[51]

---

[50] Weidner & Larson, *supra* note 37, at 9 (citing to RUPA sections 801(1), 801(2), 801(3) and 801(5) and (6)).

[51] Del. S.B. 176 syn. (emphasis added).

DRUPA modifies certain of RUPA's default rules, and also contains other provisions which have no counterpart in RUPA. Among the latter is Section 15-103(d), which provides that it is the policy of DRUPA to give maximum effect to the principal of freedom of contract and the enforceability of partnership agreements. Section 103 of RUPA provides that the partnership agreement controls in most circumstances. Section 15-103 of DRUPA similarly provides that except for certain mandatory provisions under DRUPA, "relations among the partners and between the partners and the partnership are governed by the partnership agreement," and that, "[t]o the extent the partnership agreement does not otherwise provide, [DRUPA] governs relations among the partners and between the partners and the partnership."[52] Thus, RUPA and DRUPA consist largely of default "gap-filler" provisions that govern when a partnership agreement is silent on an issue.[53]

RUPA's Section 103 also enumerates what cannot be altered by the partnership agreement. Section 201(a) is not one of those mandatory provisions.[54] Section 201 explicitly provides that a partnership is an entity distinct from its partners. Section 15-

---

[52] 6 *Del. C.* § 15-103(a).

[53] *See* Weidner & Larson, *supra* note 37, at 2 ("Under RUPA, every rule governing the relations among partners is a default rule unless it is separately listed as a mandatory rule.").

[54] *See also RUPA Annotated § 201*, *supra* note 23, at Annotated Cmt. 3 (stating that, "Section 201(a), which states that a partnership is an entity distinct from its partners, is not mentioned in the Section 103(b) list of rules that cannot be varied by agreement," and that, "[t]herefore, the partnership agreement may govern the relations among partners and between the partnership and the partners according to an aggregate model").

201(a) of DRUPA goes further and explicitly clarifies that it is a default provision that can be varied by the partnership agreement. It states:

**§ 15-201 Partnership as entity.**

(a) A partnership is a separate legal entity which is an entity distinct from its partners *unless otherwise provided in a statement of partnership existence or a statement of qualification and in a partnership agreement.*[55]

In this case, as we explain next, the JKJ Partnership did vary the entity principle embodied in Section 15-201(a) of DRUPA.

### 2. *JKJ's Partnership Agreement and its Opt-Out of Separate Legal Entity Status*

Pursuant to Section 1.02 of the Partnership Agreement, JKJ was formed as a limited liability partnership pursuant to DRUPA.[56] Thus, our analysis will proceed under DRUPA. Pursuant to Section 15-103 of DRUPA, we look to the Partnership Agreement and interpret its provisions relevant to the Questions.[57] The principles we apply to our analysis are familiar. As noted above, Section 15-103(d) of DRUPA expressly states that, "[i]t is the policy of [DRUPA] to give maximum effect to the principle of freedom of contract and to

---

[55] 6 *Del. C.* § 15-201(a).

[56] The partners agreed to "operate the Partnership as a limited liability partnership under the terms of [the Partnership] Agreement and [DRUPA]." App. to Opening Br. at A110 (Partnership Agreement).

[57] Obtaining answers to novel legal questions that will have a broad impact within Delaware is a primary purpose of allowing certification to the Delaware Supreme Court, particularly in the corporate context. *See Citigroup Inc. v. AHW Inv. P'rship*, 140 A.3d 1125 (Del. 2016) (answering certified question regarding "holder" claims); *NAF Hldgs., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175 (Del. 2015) (answering certified question regarding direct claim for breach of contract); *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554 (Del. 2014) (answering certified question regarding fee-shifting bylaw). These are novel issues, but because our answer is based principally on our interpretation of the Partnership Agreement, we view our holding as a narrow one.

the enforceability of partnership agreements."[58]  With respect to our interpretation of the

Partnership Agreement, partnership agreements are a type of contract.[59]  "We, therefore,

construe them in accordance with their terms to give effect to the parties' intent."[60]  "We

give words their plain meaning unless it appears that the parties intended a special

meaning."[61]  The "parties' intentions as reflected in the four corners of the agreement" are

given priority.[62]  "When interpreting contracts, we construe them as a whole and give effect

to every provision if it is reasonably possible."[63]  "A meaning inferred from a particular

---

[58] 6 *Del. C.* § 15-103(d).  This Court has also stated in the context of the Delaware Limited Liability Company Act (noting that, "the following observations relating to limited partnerships applies as well to limited liability companies"):

> The Act's basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and to furnish answers only in situations where the partners have not expressly made provisions in their partnership agreement.  Truly, the partnership agreement is the cornerstone of a Delaware limited partnership, and effectively constitutes the entire agreement among the partners with respect to the admission of partners to, and the creation, operation and termination of, the limited partnership.  Once partners exercise their contractual freedom in their partnership agreement, the partners have a great deal of certainty that their partnership agreement will be enforced in accordance with its terms.

*Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999) (quoting Martin I. Lubaroff & Paul Altman, *Delaware Limited Partnerships* § 1.2 (1999)).

[59] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

[60] *Id.*

[61] *Id.*; *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) ("In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning." (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)) (internal quotation marks omitted)).

[62] *GMG Capital Inv., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

[63] *Norton*, 67 A.3d at 360; *see GMG Capital*, 36 A.3d at 779 ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." (quoting *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)) (internal quotation marks omitted)).

provision cannot control the agreement if that inference conflicts with the agreement's overall scheme."[64] We "give each provision and term effect, so as not to render any part of the contract mere surplusage."[65]

The relevant Partnership Agreement provisions are set forth below:

**Section 1.01 <u>Definitions.</u>** Within the context of this Agreement, the following terms shall have the following meanings:

**"Act"** means the Delaware Revised Uniform Partnership Act.
 …

**"Partners"** means the Partners, and any Person subsequently admitted as a partner in accordance with the terms of this Agreement.

**Section 1.02 <u>Formation of Limited Liability Partnership; Name.</u>** The Partners hereby form the Partnership as a limited liability partnership pursuant to the Act. The Partners hereby agree to operate the Partnership as a limited liability partnership under the terms of this Agreement and the Act. Whenever the terms of this Agreement conflict with the Act, the terms of this Agreement shall control, except with respect to any matters contained in the Act that cannot be modified or waived by a limited liability partnership agreement . . . .

**Section 1.03 <u>No Separate Legal Entity.</u>** As authorized by Section 15-201(a) of the Act, the Partnership shall not be a separate legal entity distinct from its Partners. In the event of any conflict between the terms of this Section 1.03 and terms of any other Section of this Agreement, the terms of this Section 1.03 shall control.

**Section 1.06 <u>Purpose.</u>** The purpose and business of the Partnership is to file and prosecute the Action . . . .

**Section 1.07 <u>Term.</u>** The term of the Partnership shall commence on the date of filing of the Statement of Qualification, and the Partnership shall continue

---

[64] *Norton*, 67 A.3d at 360.

[65] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010); *see Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will not read a contract to render a provision or term 'meaningless or illusory.'").

until the final resolution or settlement of the Action without further right of appeal.

**Section 7.02** <u>Admissions</u>.  No transferee of an Interest shall be admitted as a Partner of the Partnership without the written consent of the Partners.  Any transferee of an Interest who is not admitted as a Partner shall have the rights of an assignee with respect to distributions and Profits and Losses attributable to the transferred Interest, but shall have no rights as a Partner under this Agreement or the Act.

**Section 7.03.** <u>Withdrawals</u>.  No Partner shall have the right to withdraw or dissociate from the Partnership prior to the dissolution and winding up of the Partnership except:  (i) upon 60 days prior written notice to the non-withdrawing Partner(s) or (ii) with the written consent of the non-withdrawing Partner(s).  Any assignment of rights in the Action previously made by a withdrawing Partner pursuant to Section 2.01 shall be automatically revoked and rescinded effective as of the withdrawal of such Partner.  If after any such pending withdrawal, there shall be only one Partner remaining, the non-withdrawing Partner shall have the right to admit new Partner(s) without the consent of the withdrawing Partners.

**Section 8.01** <u>Dissolution Events</u>.  Subject to <u>Section 1.07</u>, the Partnership shall be terminated and dissolved upon at such time and on the happening of such events as shall be determined by the Partners.  The death, incapacity, bankruptcy or any other incapacity or withdrawal of a Partner shall not cause a dissolution of the Partnership.

**Section 8.02** <u>Liquidation</u>.

(a)     **<u>Winding Up</u>.**  Upon the dissolution of the Partnership, the Partnership's business shall be liquidated in an orderly manner.  The Partners shall determine which Partnership property shall be distributed in-kind and which Partnership property shall be liquidated.   The liquidation of Partnership property shall be carried out as promptly as is consistent with obtaining the fair value thereof.[66]

---

[66] App. to Opening Br. at A110–A114.

Section 1.03 of the Partnership Agreement provides that, "[a]s authorized by Section 15-201(a) of the Act, *the Partnership shall not be a separate legal entity distinct from its Partners*."[67] Section 1.03 of the Partnership Agreement states in its entirety:

**Section 1.03 <u>No Separate Legal Entity.</u>**

> As authorized by Section 15-201(a) of the Act, the Partnership shall not be a separate legal entity distinct from its Partners. In the event of any conflict between the terms of this Section 1.03 and the terms of any other Section of this Agreement, the terms of Section 1.03 shall control.[68]

Thus, Section 1.03 expresses a general intent to adopt a key feature of the aggregate model, namely, that the Partnership not be distinct from its members. The plain meaning of "not a separate legal entity distinct from its Partners" means that JKJ consists of an association of Partners A, B, and C.

Despite its opt-out of entity status, Section 1.03 is premised on the notion that at least some provisions are, or could be viewed as being based on the entity model. [69] This is evident as Section 1.03 attempts to address how to resolve conflicts between provisions that derive from the two competing models. In the event that provisions conflict, Section

---

[67] *Id.* at A111 (Partnership Agreement) (emphasis added); *see also id.* at A117 (JKJ's Statement of Qualification ¶ 5).

[68] *Id.* at A111 (Partnership Agreement § 1.03).

[69] JKJ did retain certain features of the entity model, such as the shield of limited liability for the limited partners by filing a statement of qualification under 6 *Del. C.* § 15-1001 with the Delaware Secretary of State. *See id.* (Partnership Agreement § 1.04); *id.* at A117 (JKJ's Statement of Qualification ¶ 4). It also retained the entity characteristic of having property acquired by a partnership be partnership property, and that a partner is not a co-owner of partnership property, both of which can be effected only by providing so in a statement of partnership existence or a statement of qualification and in a partnership agreement. *See id.* at A112 (Partnership Agreement § 1.08); 6 *Del C.* §§ 15-203, 15-501.

1.03 gives primacy to the aggregate model by declaring that JKJ is not a separate legal entity distinct from its Partners, and it resolves any conflict by declaring that Section 1.03's preference for non-entity status trumps any other conflicting sections of the Partnership Agreement.

As explained above, DRUPA gap-filler provisions provide, as the default, that a partnership, for a term or particular undertaking, generally can have partners withdraw without triggering dissolution of the partnership.[70] Question 1 requires us to determine to what extent any "entity-based" provisions in the Partnership Agreement, and any applicable entity-based DRUPA default provisions, were overridden once the partners elected in Section 1.03 to provide that the partnership not be distinct from its partners. The replacement of Partner B with Partner G changed the composition of JKJ from an association of partners A, B, and C to an association of Partners A, C, and G. We conclude that if JKJ is "not distinct" from A, B, and C, then this new aggregation of partners A, C, and G resulted in a new partnership and dissolution of the old partnership.

In an attempt to avoid this conclusion, JKJ argues that other provisions of the Partnership Agreement show that it contractually preserved in the Partnership Agreement certain "entity" features that allow JKJ to change its partnership composition without triggering dissolution. It points to Section 8.01, which expressly states that partner withdrawals will not trigger dissolution. Section 8.01 provides in its entirety:

---

[70] For example, Section 15-801(2) provides that a partnership for a term or particular undertaking does not dissolve upon wrongful dissociation or dissociation by death or related events unless a majority of partners agree to wind up and dissociate within 90 days after the dissociation. 6 *Del. C.* § 15-801(2).

**Section 8.01 Dissolution Events.** Subject to <u>Section 1.07</u>, the Partnership shall be terminated and dissolved upon at such time and on the happening of such events as shall be determined by the Partners. The death, incapacity, bankruptcy or any other incapacity *or withdrawal of a Partner shall not cause a dissolution of the Partnership.*[71]

JKJ also contends that the Partnership Agreement contemplates partner additions. It again refers us back to Section 1.03 of the Partnership Agreement, which states that JKJ elected not to be a separate legal entity distinct from its Partners, with "Partners" being a defined term meaning, "the Partners, and any Person subsequently admitted as a partner in accordance with the terms of this Agreement."[72] JKJ then points us to Section 1.07's "Term" provision (providing that JKJ shall continue until final resolution or settlement of the action), and also refers to Section 7.02 of the Partnership Agreement, which states that "[n]o transferee of an Interest shall be admitted as a Partner of the Partnership without the written consent of the Partners."[73] Finally, JKJ argues that the entire composition of JKJ can change, and that, following such change, it can still be indistinct from these new partners.[74]

---

[71] App. to Opening Br at A114 (Partnership Agreement § 8.01) (emphasis added).

[72] *Id.* at A111. Bromberg and Ribstein comment that with respect to Section 801's list of events that do cause a dissolution, RUPA's "Section 801 is subject to contrary provision in the partnership agreement pursuant to RUPA § 103, except that the partners may not contract to avoid judicial dissolution or dissolution for unlawfulness under subsections 801(4)–(6)," and "[t]hus, the partnership can avoid dissolution by agreement." *Bromberg & Ribstein, supra* note 49, at 359. Similarly, DRUPA's Section 15-103(b)(6) provides that a partnership agreement may not "[v]ary the requirement to wind up the partnership business in cases specified in § 15-801(4), (5), or (6)." 6 *Del. C.* § 15-103(b)(6). This also implies that a partnership agreement can, otherwise, avoid dissolution by agreement.

[73] *Id.* at A114.

[74] When asked whether JKJ could remove every one of its current partners and replace each one of them and still remain an entity not distinct from its partners, JKJ's counsel responded: "Yes."

We do not find these arguments persuasive. The suggestion that the Partnership Agreement contemplates the withdrawal and substitution of new partners without causing a dissolution contradicts the plain language of Section 1.03, which states that JKJ is not a separate legal entity distinct from its partners. Thus, JKJ was not distinct from partners A, B, and C. The withdrawal of B and the substitution of G changed the composition from A, B, and C to A, C, and G. JKJ cannot be indistinct from A, B, and C and remain the same entity with a new cast of partners. To the extent the provisions cited by JKJ allow for the withdrawal and addition of new partners, they conflict with Section 1.03's rule that JKJ is not distinct from its partners, and Section 1.03 controls.[75] Accordingly, we hold that a new partnership was formed upon the replacement of Partner B with Partner G, and that the membership change effected a dissolution of the original JKJ.

---

*See* Oral Argument Video, 9:35–9:54, https://livestream.com/DelawareSupremeCourt/events/8952027/videos/200779358.

[75] We note that Section 8.01 of the Partnership Agreement provides that withdrawals may occur without triggering a dissolution, but Section 8.01 does not address the consequences of adding partners. The Defendants argue that, "[a] partner's withdrawal would not allow any new individual to circumvent the first-to-file bar, nor would it expand the partnership's aggregate knowledge in a way that bolsters its claim to 'original source' status under the public disclosure bar," and that, by contrast, "the addition of new partners would belatedly expand the partnership's knowledge, allowing the new partners to participate in a *qui tam* suit that they could not otherwise file on their own, *see* 31 U.S.C. § 3730(b)(5) (2010), and would defeat the first-to-file bar's purpose of incentivizing relators to 'promptly alert the government to the essential facts of a fraudulent scheme.'" Answering Br. at 20 n.9 (citation omitted). This makes sense to us, because, as the District Court observed, JKJ's position was that "this original JKJ partnership was able to serve as a relator in this case on the basis of its members' knowledge and legal rights, since the partnership was not legally distinct from these members." *Opinion*, 315 F. Supp. 3d at 831. However, we do not reach any issues other than the Delaware law issues presented to us. Although Section 8.01 of DRUPA contemplates that certain dissolution events might be avoided by agreement, based upon our reading of the Partnership Agreement, we hold that JKJ's controlling principle in Section 1.03, that it not be "distinct" from its partners, nevertheless, does not allow for the replacement of Partner B with Partner G, as happened here, without creating a new partnership and causing a dissolution of the old JKJ.

*B. If a "new" partnership was created upon the limited liability partnership's change in membership, was the "old" partnership terminated immediately such that it was actually the "new" partnership that filed the second amended complaint? Or did the "old" partnership continue to exist long enough in the winding-up process to file the second amended complaint?*

Generally, under DRUPA, dissolution does not terminate the partnership, and the partnership continues after dissolution only for the purpose of winding up its business or affairs.[76] Further, under DRUPA, the partnership is terminated when the winding up is complete.[77] As we held in response to Question 1, the change in membership effected a dissolution of the old JKJ. However, we cannot determine from the undisputed facts whether the winding up was completed. Therefore, we leave that determination to the trial court.

We are also asked whether the old JKJ continued to exist long enough in the winding up process to file the SAC. But we are told to accept, as an undisputed fact that, "[t]he new partner arrangement continued to prosecute this action by filing a second amended complaint." We note that paragraph 26 of the SAC alleges that, "Plaintiff/Relator, a Delaware limited liability partnership, is named JKJ PARTNERSHIP 2011 LLP . . . . There are three JKJ partners: Paul A. Gurbel, M.D., Jeffrey A. Stahl, M.D., and Kelly D.

---

[76] 6 *Del. C.* § 15-802. Section 15-802(a) of DRUPA provides:

> (a) Subject to subsection (b) of this section, a partnership continues after dissolution only for the purpose of winding up its business or affairs. The partnership is terminated when the winding up of its business or affairs is completed.

6 *Del. C.* § 15-802(a). Section 15-802 bears the heading, "Partnership continues after dissolution."

[77] 6 *Del. C.* § 15-802(a).

Evans."[78]   Thus, based upon what we are told to accept as an undisputed fact, which is supported by the SAC itself, we conclude that the new partnership filed the SAC.

Perhaps the more critical question is, did the new partnership have ownership of the litigation asset so it could pursue the action and file the SAC?  It appears that the action was partnership property at the outset of JKJ.[79]  Whether the action was retained by the original partnership or transferred to the new one is a fact-based question that we cannot determine based upon the undisputed facts.[80]

> *C. If the "old" limited liability partnership did not survive the membership change, may the original partners continue to prosecute the lawsuit as part of the "winding up" process?*

In our answer to Question 2, we concluded that the new partnership filed the SAC. Thus, it does not appear that the old partnership is prosecuting the action.  We note that the District Court was of the same view.  To illustrate, in its letter order denying JKJ's motion for reargument, the District Court addressed JKJ's argument that "the initial JKJ

---

[78] App. to Answering Br. at B183 (SAC ¶26).  The parties indicated that Kelly Wood changed her name to Kelly Evans.

[79] App. to Opening Br. at A112 (Partnership Agreement § 2.01) (stating that each of the Partners contributed and assigned to the Partnership, as an initial capital contribution "all of his or her rights, title and interest in and to the Action"); *see generally* 6 *Del. C.* § 15-204.  Section 2.01 further provides that, "[t]he assignment of such rights in and to the Action shall be valued at zero for Capital Account purposes for each Partner."  App. to Opening Br. at A112.

[80] We note that the Defendants referred to John Venditto's Notice of Withdrawal in support of their contention that the partners had transferred the litigation asset to the new partnership. Answering Br. at 30 ("Dr. Venditto's notice of withdrawal explicitly states that the partnership has 'no liabilities and no value as of the date of this withdrawal.'"); App. to Opening Br. at A119 (John Venditto's Notice of Withdrawal).  JKJ responded that the action had no value because that is how it was treated at the outset in valuing it for Capital Account purposes.  The debate at oral argument about this notice, the value of the action, and whether it was transferred, illustrates the nature of the factual inquiry which we cannot resolve.

partnership still has the power to prosecute this lawsuit as part of 'winding up' its affairs."[81]

In rejecting this argument, the District Court stated:

> In stark contrast to this case, however, Plaintiff cites no authority, and the Court cannot find any, that stands for the proposition that the original partnership of JKJ—formed for the main purpose of pursuing this litigation as a relator—can continue as a viable entity in the same litigation *after* the partnership has dissolved. But, even if JKJ partnership could continue to prosecute this lawsuit, it has chosen not to do so. In fact, the Second Amended Complaint only names the new JKJ partnership, with Dr. Gurbel as an added partner, as the sole relator in this lawsuit. Nowhere in that Complaint does Plaintiff suggest[ ] that the original JKJ partnership is a part of this action, or that the now-dissolved partnership is winding up its business by continuing with this case until conclusion. Instead, the opposite is true; JKJ took conscious steps to replace a partner in the partnership for the sole purpose of pursuing this litigation as a newly-formed entity. Now, in hindsight, JKJ seeks to revive its old partnership after this Court's ruling; the fact that the original, dissolved JKJ partnership is still part of this case simply contradicts the record.[82]

Notwithstanding the District Court's observation that the old JKJ is not pursuing the action, and our answer to Question 2 (that the new JKJ filed the SAC), we are now being asked whether the old partnership can pursue the action. We hold that it cannot. Question 3 appears to assume that the winding up process has not been completed. We will attempt to answer that question accepting that assumption.

Pursuant to Section 8.02(a) of the Partnership Agreement, and as consistent with DRUPA, dissolution triggers the winding up process. Section 8.02 of the Partnership Agreement addresses the "winding up" process and provides:

---

[81] *In re: Plavix Mktg., Sales Practices and Prod. Liab. Litig*, No. 11-06476(FLW), at 4 (D.N.J. Aug. 6, 2018), Opening Br. Ex. C.

[82] *Id.*

(a) **<u>Winding Up.</u>** Upon the dissolution of the Partnership, the Partnership's business shall be liquidated in an orderly manner. The Partners shall determine which Partnership property shall be distributed in-kind and which Partnership property shall be liquidated. The liquidation of Partnership property shall be carried out as promptly as is consistent with obtaining the fair value thereof.[83]

The Partnership Agreement does not expressly address whether, and/or to what extent, the Partnership can undertake the prosecution or defense of litigation in the winding up phase.[84] Assuming *arguendo* that at least some litigation activity is generally permissible in the winding up phase, Section 8.02(a) requires the business of the Partnership to be *liquidated* promptly or distributed in-kind. The concept of "liquidating" Partnership property is inconsistent with continuing with carrying on the business for which the Partnership was established. The Partnership Agreement makes clear that for JKJ, pursuing the action is the singular purpose for which JKJ was formed. This purpose is explicitly stated in Section 1.06 of the Partnership Agreement entitled, "Purpose," which states that, "[t]he purpose and business of the Partnership is to file and prosecute the Action."[85] Although there is

---

[83] App. to Opening Br. at A114 (Partnership Agreement).

[84] Compare Section 15-803(c) of DRUPA, which expressly contemplates that the prosecution and defense of actions can take place in the winding up phase. 6 *Del. C.* § 15-803(c).

[85] App. to Opening Br. at A110. The prefatory "Background" section of the Partnership Agreement also describes the purpose of JKJ as follows:

> The Partners have entered into a Common Interest and Joint Prosecution Agreement, as the same may be amended from time to time (the "Joint Prosecution Agreement") providing for their cooperation in the filing and prosecution of a whistleblower action as described in the Joint Prosecution Agreement (the "Action").

> The parties hereby desire (i) to file and prosecute the Action through a limited liability partnership formed pursuant to the Act and this Agreement and (ii) enter

little Delaware case law precisely on point, the Official Comments to Section 801 of RUPA suggest that continuing with the main business of the partnership is not consistent with "winding up":

> Under RUPA, "dissolution" is merely the commencement of the winding up process. The partnership continues for the limited purpose of winding up the business. In effect, *that means the scope of the partnership business contracts to completing work in process and taking such other actions as may be necessary to wind up the business.* Winding up the partnership business entails selling its assets, paying its debts, and distributing the net balance, if any, to the partners in cash according to their interests. The partnership entity continues, and the partners are associated in the winding up of the business until winding up is completed. When the winding up is completed, the partnership entity terminates.[86]

Generally, cases in both the partnership[87] and the corporate context[88] suggest that this allowance for litigation in the winding up phase is, more typically, ancillary to the

---

into this Agreement to form such limited liability partnership and to set forth their respective rights, duties and obligations with respect thereto.

*Id.*

[86] *RUPA Annotated § 801*, *supra* note 48, at Official Cmt. 2.

[87] *See*, *e.g.*, *Caines Landing Wildlife Preserve Ass'n v. Kirkpatrick*, 633 A.2d 369, 1993 WL 397606, at *2 (Del. Oct. 1, 1993) (Table) (stating that, "[u]pon dissolution, the partners of a general partnership have a duty to wind up its affairs," that "a partnership continues after dissolution *only* for the purpose of winding up the partnership affairs, unless the partners agree otherwise or innocent partners exercise a right to continuation of the business," and that, "[a]s with a corporation in dissolution, the business of a dissolved general partnership should continue only if doing so is consistent with the objective of winding up its affairs" (emphasis in original)); *Paciaroni v. Crane*, 408 A.2d 946, 955 (Del. Ch. 1979) (noting that "it is generally accepted that once dissolution occurs, the partnership continues only to the extent necessary to close out affairs and complete transactions begun but not then finished").

[88] In the corporate context, for example, following dissolution, the corporation may conduct any business "incidental and necessary to the delegated power to wind up" within the three-year period after dissolution. *McBride v. Murphy*, 124 A. 798, 801 (Del. Ch. 1924), *aff'd*, 130 A. 283 (Del. 1925); *see also Broza v. Aluminum Cleaner Corp.*, 159 A. 430, 432 (Del. Ch. 1932). Generally, "a dissolved corporation's powers during the three-year wind up period are limited to closing its affairs and do not extend to carrying on the business for which it was established." Edward P.

main business of the entity, and, thus, normally would not extend to situations where the primary purpose of the partnership is to pursue that particular litigation. This would be especially true if the litigation were in its beginning stages.[89]

Because of the dearth of case law in this area, we confine our holding to the limited facts presented to us. We hold that the old JKJ may not continue to prosecute the action as a part of its winding up process, because to do so would be inconsistent with Section 8.02 of the Partnership Agreement, which directs that, "[t]he liquidation of Partnership property shall be carried out as promptly as is consistent with obtaining the fair value thereof,"[90] and because the action is in its beginning phases and is the sole purpose for which JKJ was established.

## *IV. Conclusion*

Based on the foregoing, the questions of law certified to the Court by the United States Court of Appeals for the Third Circuit are answered as follows:

1. A limited liability partnership is formed to file and prosecute a specific lawsuit. Its formational documents say both that the partnership is not "a separate legal entity distinct from its Partners" under 6 Del. Code § 15-201(a) and that the

---

Welch et al., *Folk on the Delaware General Corporation Law* § 278.02 (2020 ed.) (citing *Addy v. Short*, 89 A.2d 136, 163 (Del. 1952)); *Gamble v. Penn Valley Crude Oil Corp.*, 104 A.2d 257, 260 (Del. Ch. 1954) (construing 8 *Del. C.* § 278 and stating that a dissolved corporation "has the power to close its affairs but not to carry on the business for which it is established"); *Johnson v. Helicopter & Airplane Servs. Corp.*, 404 F. Supp. 726, 731 (D. Md. 1975) (observing that under 8 *Del. C.* § 278, "a corporation's existence is continued for three years after dissolution," and that, "[d]uring that time, the corporation may not conduct the business for which it was originally incorporated").

[89] We could conceive of a situation where a litigation, which was the main purpose for which a partnership was formed, was in the final stages of being resolved. We offer no view as to whether such a scenario may call for a different outcome.

[90] App. to Opening Br. at A114.

"withdrawal of a Partner shall not cause a dissolution of the Partnership." If one of the partners leaves the partnership and a new partner joins, does it stay the same partnership? Or is it a new partnership?

**ANSWER:** For the reasons explained above, we hold that the change in membership created a new partnership and caused a dissolution of the original JKJ.

2. If a "new" partnership was created upon the limited liability partnership's change in membership, was the "old" partnership terminated immediately such that it was actually the "new" partnership that filed the second amended complaint? Or did the "old" partnership continue to exist long enough in the winding-up process to file the second amended complaint?

**ANSWER:** The "old" partnership continues to exist until winding up is complete and it is terminated. We cannot determine from the undisputed facts whether it was terminated. We are told in (f) of the undisputed facts that the new partnership filed the SAC—a fact reflected in paragraph 26 of the SAC. Thus, we conclude that it was the "new" partnership that filed the SAC. Whether the new partnership possessed the litigation asset is another factual inquiry that we are unable to determine from the undisputed facts.

3. If the "old" limited liability partnership did not survive the membership change, may the original partners continue to prosecute the lawsuit as part of the "winding up" process?

**ANSWER:** We hold that the old JKJ may not continue to prosecute the action as a part of its winding up process, because to do so would be inconsistent with Section 8.02 of the Partnership Agreement, and because the action is in its beginning phases and is the sole purpose for which JKJ was established.